# BALTIMORE *v.* BALTIMORE TRUST AND GUAR-ANTEE COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MARYLAND.

### No. 209. Argued March 11, 12, 1897. — Decided April 26, 1897.

The direction of the municipal authorities of Baltimore to the street railroad company to maintain but one track through Lexington street from and to the points named, instead of a double track as originally granted to the company, did not substantially change the terms of the contract (if there was one) between the city and the railroad as expressed in the original grant, and was no more than the exercise by the city of its acknowledged power to make a reasonable regulation concerning the use of the street by the railroad company.

THE appellee, being the plaintiff below, brought this action in the Circuit Court of the United States for the district of Maryland, for the purpose of enjoining the city authorities from tearing up or interfering with the railroad track laid down by the Lake Roland Elevated Railroad Company on Lexington street, in the city of Baltimore. The bill and the answer were duly filed in April, 1893, and the following are substantially the facts upon which the case was heard and determined by the court below:

The plaintiff sued as trustee and mortgagee named in a mortgage executed by the Lake Roland Company to secure the payment of certain bonds issued and to be issued by the company for the purpose of raising funds to construct its road. The mortgage was upon all the property of the company, its railroad, plant, tracks, etc., and was executed on the 1st day of September in the year 1892. The amount of the bonds which the mortgage so secured was a million dollars, the principal payable on the 1st of September in the year 1942. It was on the ground that the proposed action, hereafter mentioned, on the part of the city authorities would result in a most material impairment of the security of the mortgage that this suit was brought by the trustee and mortgagee for the purpose of restraining such action.

The Lake Roland Company was the result of a consolidation

of two railway companies, one of which, called the North Avenue Railway Company of Baltimore city, had the franchise to construct and operate a passenger railway in the city of Baltimore, the whole line of which road was to be located in that city. The Lake Roland Company succeeded to all the rights acquired by the North Avenue Railway Company. The legislature of Maryland, by the act of the Laws of 1890, c. 370, among other things enacted that "the mayor and city council of Baltimore shall have the power to regulate the use of the streets, lanes and alleys in said city by railway or other tracks," etc. On the 8th of April, 1891, the common council of Baltimore passed what is termed ordinance No. 23, by which it authorized the North Avenue Railway Company of Baltimore city, in connection with its tracks in other streets mentioned in the ordinance, "to lay down and construct double iron railway tracks for the purposes of its business, . . . on Lexington street westwardly to Charles street from North street." This is a distance of about eleven hundred feet. The right was also given to the company to operate its road by electricity supplied from overhead wires, and the tracks, wires and poles were to be laid and constructed under the supervision and direction of the city commissioner. Various other conditions and regulations were contained in the ordinance, all of which the railroad company accepted. As a portion of the road to be constructed consisted of an elevated road, it became necessary to obtain the sanction of the legislature before the company undertook the execution of the work. Accordingly chapter 112 of the Laws of 1892 was passed, the first section of which ratified and confirmed ordinance No. 23, with "the same effect as if the mayor and city council of Baltimore, at the time of the passage of said ordinance, had been fully authorized by the general assembly to pass said ordinance, and to grant each and all of the powers and privileges therein contained; the said mayor and city council to have the same power and control hereafter in reference to the enforcement, amendment or repeal of said ordinance as it has or would have in respect to any ordinance passed under its general powers."

Subsequently to the passage of this act of 1892, the Lake

Roland Company, in the summer and fall of 1892, commenced to lay its tracks in the city and to build a portion of its elevated road. Prior to the laying down of any tracks on Lexington street, between North and Calvert streets, the latter being a street which crosses Lexington street between North and Charles streets at a distance of between three and four hundred feet west from North street, it became known to the railroad company that the mayor and some of the city authorities were opposed to the laying of double tracks in that street between those points. This was a short time prior to the 7th day of November, 1892. On that day the mayor wrote a letter to the president of the railway company, in which he stated that he had noticed the company had commenced laying double tracks on Lexington street, between North and Calvert streets, and that the public interest in his judgment required that no more than a single track should be laid on Lexington street at that point, and that the law officers of the city had informed him that it was competent for the city council to prohibit the laying of double tracks there. The mayor also stated that at the next session of the council an ordinance would be introduced prohibiting the company from laying double tracks on the portion of Lexington street above described. He ended by saying: "I write you this to prevent you from going to the unnecessary expense of laying a system of double tracks and afterwards being required to remove them." On the same day the president of the railroad company received from the city solicitor a notice that he was, at the request of the mayor, preparing an ordinance to prohibit the railroad company from laying more than a single track on Lexington street, between North and Calvert, and he offered to permit the president of the railroad company to see the proposed ordinance before it was sent to the council. It is stated, however, on the part of the railroad company that at no time prior to the 12th day of November, 1892, two days prior to the passage of the ordinance hereafter spoken of, was there any intimation given to the officers of the company that there was any opposition to the laying of the company's double tracks on Lexington street, between

Calvert and Charles streets, which was a distance of between seven and eight hundred feet immediately west of Calvert street, and the portion of Lexington street, between Calvert and North streets, was immediately east from Calvert street. It is asserted on the part of the company that it laid the double tracks on Lexington street, between Calvert and Charles streets, without opposition on the part of any one so far as it knew, but it admits that it did lay the double tracks between North and Calvert streets, notwithstanding the receipt of the letters mentioned and in spite of the known opposition of the mayor. This work was done, between North and Calvert streets, during the night and on election day, so that before the 14th of November, 1892, the work of laying the double tracks on Lexington street had been substantially completed the whole distance between North and Charles streets. The common council of the city met on the day last named, and passed "An ordinance to regulate the use of Lexington street between North street and Charles street, by railway tracks, and to prohibit the laying or maintaining or using by North Avenue Railway Company, or any other person or corporation, of more than a single iron railway track upon said portion of Lexington street." The first section of this ordinance reads as follows:

"SECTION 1. *Be it enacted and ordained by the mayor and city council of Baltimore,* That the first section of ordinance No. 23, approved April 8, 1891, so far as the same authorized and empowered the North Avenue Railway Company to lay double iron railway tracks upon the portion of East Lexington street between North street and Charles street, be, and hereby is, repealed, and that the authority and license given to said North Avenue Railway Company by said first section of said ordinance to lay such double iron railway tracks, be, and hereby is, revoked."

(It will be observed that this ordinance, instead of confining the single track to that portion only of Lexington street lying between North and *Calvert* streets, as spoken of by the mayor, included the whole of Lexington street between North and *Charles* streets.)

The second section of the same ordinance prohibited any person or corporation from laying down railway tracks on Lexington street except as provided in the succeeding section of the ordinance, and directed that all tracks which had been theretofore placed on Lexington street should be removed by the persons who laid them, within ten days after they received notice to that effect from the city commissioner.

The third section authorized the railroad company to lay down and maintain one track and no more on Lexington street, "upon the same terms and subject to the same provisions and limitations as were provided by the city ordinance No. 23, of April 8, 1891, in respect to double iron railway tracks there authorized to be laid on said portion of Lexington street." The third section contained also the following proviso: "Provided, as a condition precedent to the right of the North Avenue Railway Company to exercise the authority or license in this section conferred upon it, the said North Avenue Railway Company shall within twenty days from the passage of this ordinance, at its own expense, remove the whole or such portion of the double iron railway tracks that it has caused to be laid on said portion of Lexington street, as the city commissioner shall designate, and shall also, at its own expense, replace the pavement on the said portion of East Lexington street in a manner satisfactory to the city commissioner."

After the passage of this ordinance and before the expiration of the twenty days mentioned in the proviso to the third section, the railroad company, not admitting the right of the city to pass such ordinance or to compel the company to take up one of its tracks, and yet being embarrassed by the proviso as to the necessity of taking up the tracks within twenty days, came to an understanding with the city authorities that, as both parties desired a speedy determination of the question of law, a case should be made which should raise that question, and it should be presented to the courts for their decision, and that in the meantime the provision limiting the time in which to take up the track would not be enforced. Accordingly a bill was filed in the city court of Baltimore by

the railroad company raising the question, and a demurrer on the part of the city was served and a decree taken against the company *pro forma* in that court. An appeal was then taken by the company to the Court of Appeals of Maryland, which court after full argument of the question decided the case on its merits, and affirmed the judgment of dismissal directed by the court below. *Lake Roland Elevated Railway* v. *Baltimore*, 77 Maryland, 352. This decision was rendered about the 16th of March, 1893.

Thereafter the railroad company took up one of its tracks on Lexington street and located the other under the direction of the city commissioner and proceeded with due diligence to lay down a single track on Lexington street and to restore the street to its proper condition.

While engaged in this work and on the 1st of April, 1893, the mayor notified the company by letter that he was advised that the company had no authority to lay its track on the bed of Lexington street between North and Charles streets in the absence of an ordinance granting such a privilege from the mayor and city council. (This letter, it is supposed, was based upon the proposition that the company had not complied with the condition contained in the ordinance of November, 1892, already mentioned.) The mayor therefore advised the company that, in the opinion of the city law officers, the present single track of the company occupying the bed of the street was a violation of law. A suggestion was made by him that an application for an ordinance be at once made to the city council, and that there should be no delay in the matter, as the public convenience required Lexington street to be promptly made passable by repaving. The president of the company replied, declining, under the circumstances, to ask for the passage of another ordinance, because, as he was advised and believed, the company already had a clear right to lay down and maintain its tracks on Lexington street. The mayor, on April 5, 1893, then notified the company that on Wednesday, April 12, the commissioner would commence to take up the tracks on Lexington street, unless in the meantime the railroad company applied to the city council, which.

would meet on April 10, for an ordinance giving it a right to keep its track on the street.

Soon afterwards, and on the 15th of April, 1893, this suit was commenced. In the bill it was alleged that if the city were permitted to take up the tracks it would be impossible for the company to reach its terminus at the corner of Charles and Lexington streets, and that as the entire railway system of the company was on the eve of completion and operation, it would suffer great damage by the removal of the tracks; the plaintiff also claimed that ordinance No. 23, having been accepted and acted upon by the railroad company, there was thereby constituted an irrepealable and inviolable contract between the municipal corporation and the railroad company, the terms of which could not be altered or impaired without the consent of both parties to the contract, and that, therefore, the subsequent ordinance purporting to change the terms of the original so as to deprive the railroad company of the right to reach its terminus with double tracks was in contravention of the tenth section of the first article of the Constitution of the United States, which prevents legislation which impairs the obligation of contracts, and for that reason the subsequent ordinance was void. It was also alleged that the proposed action of the city authorities was not only invalid, but that it tended directly to impair the value of the mortgage security held by the plaintiff trust company as trustee for the bondholders.

On the other side it was alleged on the part of the common council that the original ordinance was nothing but a revocable license, and that the existence of double tracks in that portion of Lexington street, lying between North and Charles streets, would be inconsistent with the reasonable use of the street at that point by the public and by other vehicles; that the street was so narrow as to leave but just sufficient room between the curb and the railroad tracks for ordinary vehicles to pass, and that those which were of extra width could not meet or pass a car on the same side of the street; that the street was one of the main thoroughfares running east and west in the city of Baltimore; that at certain portions of the day it was crowded with vehicles of all descriptions, and

that to permit the use of the street at the point in question by this company, with its electric cars running at a comparatively high rate of speed and with double tracks laid in the street, would prevent the reasonable use of the same by the public, and would be dangerous in the extreme and directly tend to loss of life and injury to property.

As to the matter of convenience to the public and of necessity to the company, the latter asserted it would, in fact, accommodate the public more to have double tracks than a single one, while it was a real necessity to the company in order that it might, by giving accommodation to the public, impossible with a single track, successfully compete with rival roads running through adjacent streets for a fair share of patronage; that it could not do so, if it had but a single track for eleven hundred feet on Lexington street.

Upon these facts the case was heard in the court below, and that court held that ordinance No. 23, upon its acceptance by the railroad company, became a contract between the city and the railroad company, which could not be substantially modified without the consent of both parties, and that the subsequent ordinance was a violation of that contract and therefore invalid, and a judgment was ordered enjoining the city authorities from interfering with the railroad company in the construction and maintenance of two parallel tracks on Lexington street, and from interfering in any manner with the company in the operation of its electric cars over and upon such tracks, provided the two tracks are laid and maintained and the cars operated in conformity with the provisions of ordinance No. 23, and in conformity with the general regulations of the mayor and common council of Baltimore relating to the construction and operation of such street railways, not inconsistent with the provisions of ordinance No. 23, above mentioned. From this decree, Judge Morris, District Judge in the district of Maryland, dissented. 64 Fed. Rep. 153. An appeal having been taken by the city of Baltimore, the case was brought here for review.

*Mr. Thomas G. Hayes* for appellant. *Mr. Thomas Ireland Elliott* was on his brief.

*Mr. Francis K. Carey* and *Mr. E. J. D. Cross* for appellee. *Mr. John N. Steele* and *Mr. John E. Semmes* were on their brief.

MR. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

The discussion on the argument of this case took quite a wide range, but in the view we take, we can dispose of this appeal without deciding whether the common council had or had not the power to make a contract for the perpetual use of its streets by the railroad company, upon the terms and conditions which might be agreed upon between the common council and the railroad company, and which when once agreed upon should not be thereafter subject to repeal or material alteration by the common council. It is sufficient for the decision of this case to hold that the direction to lay but one track through Lexington street, between the points mentioned, did not substantially change the terms of the contract, and was no more than the exercise by the city of its acknowledged power to make a reasonable regulation concerning the use of that street by the railroad company and that the original contract (assuming that one existed) was entered into subject to the right of the city to adopt such a regulation.

Chapter 370 of the act of 1890, referred to in the foregoing statement of facts, distinctly granted to the mayor and city council of Baltimore the power to regulate the use of the streets by railway companies. In the absence of any such positive legislation, we think there could be no well founded doubt of this power, and that any contract entered into by the city with a railroad company would be subject to its exercise, so long as it did not materially modify or impair the rights granted by the contract. Indeed, no question is made of the existence of a power of regulation by any party to this suit. It was not denied by the court below. The only dispute on this branch of the case between the parties is in regard to the question whether the direction to lay but a single track on Lexington street, between the points men-

tioned, is or is not a reasonable regulation of the use of that street to which the contract was subjected, as above stated.

We are not now concerned with the question of the right of the common council absolutely or unconditionally to repeal ordinance No. 23, but simply as to whether the passage of the subsequent ordinance amounted to a valid regulation of the use of the street by the railroad company. We think that the later ordinance, although the word "repeal" was used in its first section, was in substance a regulation of the use of the street which the city had the power to enact. The effect of the whole ordinance was simply to change the right of the company to operate its road on Lexington street for eleven hundred feet, so that instead of using double tracks it should have in that street but a single track.

There is sufficient in the case before us from which it may be seen that the laying down of double tracks in some portion of the street in question was done with the knowledge that it was against the wishes of the mayor and the city authorities, and in spite of the notification by them to the company that immediate measures would be taken to have ordinance No. 23 so altered by the common council at its first session as to provide for the laying of but one track instead of double tracks between North and Calvert streets on Lexington street. Notwithstanding such notice the company proceeded by working night and day to lay down the double tracks in Lexington street between the points last named. In looking at the question, therefore, of the reasonableness of the ordinance which made no provision for payment by the city of the expense of taking up one track and relocating the other along Lexington street, but which on the contrary provided that it should be done at the expense of the railroad company, it is proper that we should view the case as if the proposed regulation had been passed before the company had laid any track on Lexington street, between North and Calvert streets, and before it had been put to any expense on account of such double track. We cannot say the regulation was unreasonable simply on the ground that it did not provide for paying the expense of taking up one track already laid in the street between Calvert

and Charles streets (a distance of a few hundred feet), to the laying of which the city had not, at the time, objected. Having at one time granted the right to the company to lay double tracks through certain named streets of the city of Baltimore, was it a reasonable regulation of the use of one of those streets to thereafter, and before the completion and operation of the road therein, provide that but a single track in that street should be used instead of the double tracks which had been first provided for?

Upon the facts already set forth a sufficient foundation was laid for the exercise of a fair and reasonable legislative discretion in determining the question whether the portion of the street mentioned should be occupied by a single or double track of the railway company. A regulation of that portion of the street by subjecting it to the use of but one instead of double railway tracks did not (in our judgment) thereby materially modify nor did it, in effect, prohibit the exercise of the privileges previously granted by the city to the railroad company, nor did it impair the obligation of the contract or destroy vested rights, nor was this regulation substantially inconsistent with the terms of ordinance No. 23. While that ordinance provided generally for double tracks through the streets mentioned therein, the reduction of the right to use two tracks and the granting of the right to use but one for such a comparatively short distance in one particularly crowded and narrow thoroughfare was not a regulation inconsistent with the terms of the original ordinance. It would, we think, be unreasonable to hold that the least limitation of the power to operate double tracks was an infringement and impairment of the contract as set forth in the ordinance. In our opinion, the ordinance does not give any such cast iron right or one which shall be beyond any reasonable limitation and supervision by the city. It granted the use of the streets for double tracks for many miles, and the subsequent limitation of that use to one track related to but a few hundred feet where peculiar and exceptional conditions existed, where the danger to be apprehended from the use of electric cars on double tracks in a narrow and busy thoroughfare was very

great, and where it might fairly be decided by the common council that double tracks at that point would be an unreasonable and dangerous use of the street by the company and directly tend to prevent its reasonable and safe use and enjoyment by the public at large.

In *St. Louis* v. *Western Union Telegraph Co.*, 149 U. S. 465, 469, Mr. Justice Brewer, in delivering the opinion of the court in regard to the power of regulation of the streets of a city, said:

" It is given power to open and establish streets, to improve them as it sees fit, and to regulate their use, paying for all this out of its own funds. The word ' regulate' is one of broad import. It is the word used in the Federal Constitution to define the power of Congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be. If the city gives a right to the use of the streets or public grounds, as it did by ordinance No. 11,604, it simply regulates the use when it prescribes the terms and conditions upon which they shall be used. If it should see fit to construct an expensive boulevard in the city, and then limit the use to vehicles of a certain kind, or exact a toll from all who use it, would that be other than a regulation of the use ? And so it is only a matter of regulation of use when the city grants to the telegraph company the right to use exclusively a portion of the street, on condition of contributing something towards the expense it has been put to in opening and improving the street."

To same effect, see *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 203 : " The power to *regulate* commerce," says Mr. Justice Field, speaking for this court, " is the power to prescribe the rules by which it shall be governed, that is, the conditions upon which it shall be conducted."

If it be said in this case that the city had already regulated the use by prescribing that there should be two tracks, the answer is that this power of regulation is a continuing power ; it is not exhausted by being once exercised, and so long as the object is plainly one of regulation, the power may be exercised

as ·often as and whenever the common council may think proper; the use of the street may be subjected to one con-. dition to-day and to another and additional one to-morrow, provided the power is exercised in good faith and the condition imposed is appropriate as a reasonable regulation, and is not imposed arbitrarily or capriciously. *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650, 672; *N. Y. & N. E. Railroad* v. *Bristol,* 151 U. S. 556, 567.

The effect of the third section of the latter ordinance was to leave with the railroad company the power to lay down and maintain and use one track instead of double tracks on Lexington street between the streets named. It is true the city assumed to attach a condition to the exercise of this right, which was that the railroad company should within twenty days remove the double tracks and replace the pavement. In view of all the facts, we should incline to regard this as in the nature of a penalty to secure obedience of the company to the regulation, and in ·any event, in the light of the conduct of the parties in relation to the litigation in.the state court, we think the railroad company has not lost the right to maintain one track in the street in question as it now exists, without the adoption of any further ordinance on the subject.

On the ground which we have stated, we think the decree of the Circuit Court wrong, and for that reason it must be

*Reversed, and the cause remanded for further proceedings not inconsistent with this opinion.*