## WABASH RAILROAD COMPANY *v.* DEFIANCE.

### ERROR TO THE SUPREME COURT OF THE STATE OF OHIO.

No. 239.  Argued March 25, 26, 1897. — Decided May 10, 1897.

In 1887, the municipal authorities of Defiance authorized the erection of bridges over the Wabash Railroad, and about eighteen feet above its track, by the railroad company, to take the place of two existing bridges. In 1893, the common council of Defiance changed the grade of the streets crossing on said bridges to the level of the railroad, and changed the approaches to it by causing them to descend to the level of the railroad. *Held,* that the common council acted within its powers in changing the grade of the streets in question, and that the railroad company had no legal right to complain of its action.

The legislative power of a city may control and improve its streets, and a power to that effect, when duly exercised by ordinances, will override any license previously given, by which the control of a certain street has been surrendered.

In this case, it was purely within the discretion of the common council to determine whether the public exigencies required that the grade of the street be so changed as to cross the railroad at a level

THIS was a petition, in the nature of a bill in equity, originally filed in the Court of Common Pleas for Defiance County, Ohio, to enjoin the city of Defiance from proceeding with a contemplated improvement of North Clinton street and Ralston avenue, by which those streets would be so graded as to necessitate the removal of certain bridges erected by the plaintiff over its roadway, where it crosses those streets, and also the approaches constructed by the plaintiff to those bridges.

The material facts were that, in the year 1887, the Wabash, St. Louis and Pacific Railway Company, then operated by one McNulta as receiver, crossed two public streets or highways in that city, known as the Holgate pike and the Brunersburg road, respectively, at a grade about eighteen feet below the grade of said streets, where the same crossed the railway, and that there were two overhead wooden bridges at about that distance above the track of the railway.

On December 20, 1887, the city council of Defiance passed

an ordinance permitting this railway to erect new bridges over and across its track, where the same crossed these two highways, provided said bridges should be of good and substantial construction, placed in the centre of the street, with eighteen feet wide roadway, good and substantial sidewalks, eight feet on each side of said bridges, and with proper railings on each side of said walks, which bridges and walks were to be kept in good repair by the company. The railway was further required to allow a distance of twenty-one feet in the clear between the tops of its rails and the bottom of the floor beams of the bridges, and also to construct approaches at not exceeding one and one quarter inches to the foot grade, and to make the same solid by either stone or gravel, etc.; all to be done to the approval of the city and to be kept in repair by the company. This ordinance is printed at length in the margin.[1]

---

[1] An ordinance permitting Wabash, St. Louis and Pacific Railway to construct bridges at Holgate pike and Brunersburg road.

Be it ordained, by the council of the city of Defiance, Ohio:

SEC. 1. That the Wabash, St. Louis and Pacific Railway Company is hereby authorized to erect new bridges over and across the track of the railway of said company where the same crosses the public streets in the Third ward of said city, known as the Brunersburg road and Holgate pike, provided said bridges shall be of good and substantial construction, placed in the centre of said street, be eighteen feet wide roadway, with good and substantial sidewalk eight feet wide on each side of said bridges, with proper railings on each side of said walks, said bridges and sidewalks to be at all times kept in good order and repair by said company. And said railway company is hereby further authorized to construct each of said bridges of sufficient height to give a distance of twenty-one feet in the clear between the tops of the rail of said railway at its present grade and the bottom of the floor beams of said bridges, provided always that said company shall provide and construct good and sufficient approaches and grade to each of said bridges, and extend the same to sufficient distance to give a grade of not to exceed one and one fourth inches to the foot, and to conform to the width of the present street, said grade to be made firm and solid, by either stone or gravel, at the option of said company, provided that if gravel be used, said city will permit it to be taken from their gravel bed without charge, and to construct and keep in constant repair good and proper approaches to said sidewalks, and brought to the proper level of the present walk by broad, safe steps where the grade would be too great for a safe incline; and all to be done to the approval of the city, and all to be kept in

Thereupon McNulta, acting as receiver, caused these overhead bridges to be constructed with their approaches, at a cost of more than $2300.

The terms and conditions imposed by the ordinance seem to have been faithfully kept and performed by him and by the plaintiff, since it was placed in possession of said railway property, which was sold under a decree of the United States Circuit Court, to the plaintiff as purchaser, whereby it became vested with the railway, and all its rights arising under this ordinance.

On February 7, 1893, the common council of the city passed two ordinances applicable to North Clinton street, formerly known as the Holgate pike, and Ralston avenue, formerly known as the Brunersburg road, changing the grade of that part of each of said streets where they crossed the railway track to the level of the railway, and so changing the approaches as to cause them to descend to the level of the road; and further providing that the cost and expense of such improvements should be paid out of the general fund, and levied and assessed upon the general tax list upon all real and personal property in the corporation.

Plaintiff averred, in this connection, that the sole purpose of these ordinances was to cause the overhead bridges and the approaches thereto to be destroyed and removed, and the crossing of said highways reduced to a crossing of the same grade as the railway tracks; that if the city is allowed to carry out its purpose, such crossings will be extremely dangerous

---

repair to the extent of said company's right of way at all times by said company.

Sec. 2. The entering upon the work of constructing said bridges by said company shall be taken as an acceptance of the terms thereof by said company, and shall be regarded as superseding any contract or agreement heretofore existing between said company and said city as to either of said bridges.

Sec. 3. This ordinance shall take effect and be in force from and after its passage and due publication.

Done at the council chamber in regular session this 20th day of December, 1887.

　　　Attest:　　　　　　　　　　　Jas. A. Kitchel, *City Clerk.*

to all persons having occasion to use the same, by the fact
that the roads will approach the tracks at a steep, downward
decline on both sides; that the railway track at these points
is on a heavy grade, which renders it very difficult to control
the speed of trains, and that the danger of a grade crossing
will be vastly increased. Plaintiff further averred that since
the year 1856 its railway track had been crossed by said high-
ways by overhead crossings, consisting of bridges about eigh-
teen feet in the clear above the level of the tracks. "That
said highways then, as now, crossed the railway track at
points near together, to wit, about 196 feet, and converge
so as to meet at a distance of 70 feet from the railway right
of way. That the railway track at said crossings lies in a deep
cut, about eleven or twelve feet below the natural surface of
the ground, and is on a heavy down grade and curve, and on
one of said highways buildings are so located as to almost, if
not entirely, cut off the view of approaching trains from per-
sons approaching said track from the southerly side of the
same. That, if said crossings are reduced to grade, as pro-
posed by said ordinances, the approaches to said track will
be down a steep inclined plane on both sides of said track,
on both said highways; so that at said crossings the said
highways will be cut to a depth of about eleven and one half
feet below the adjacent lands. That it will be almost if not
quite impossible for heavily loaded teams to stop for trains
when approaching said track; and that by reason of the deep
cuts both of said railway and highways in which said cross-
ings will be located and of the curve and grade of said rail-
way at said points, the sound of any signal and the sound and
sight of approaching trains will be cut off, and said crossings
will be excessively difficult and dangerous to the lives of
persons crossing plaintiff's track along said highways, and to
the lives, limbs and property of its passengers and patrons,
being carried on the trains of the plaintiff, on account of
unavoidable accidents and collisions there happening, and
that thereby there will be cast upon the plaintiff an addi-
tional burden and liability to its said passengers and the
public. That the natural conformity of the lands at said

crossing is such as to make overhead bridge crossings of said public highways over plaintiff's said track absolutely essential to the public safety."

The answer admitted most of the allegations of the petition, and averred that notice was duly published of the proposed improvements in a newspaper of general circulation in the city of Defiance, and written notice was duly served upon the plaintiff; but that the plaintiff did not, at any time, file any claim for damages by reason of such improvements, whereby it has waived the same, and is barred from claiming such damages.

Upon a hearing upon pleadings and proofs in the Court of Common Pleas, the petition was dismissed. Plaintiff appealed to the Circuit Court, and applied for an interlocutory injunction, which was granted, but was subsequently dissolved upon final hearing, and the petition again dismissed. 10 Ohio Circt. Ct. 27. The case was carried by writ of error to the Supreme Court of the State, and the judgment of the Circuit Court affirmed. 52 Ohio St. 262. Whereupon plaintiff sued out a writ of error from this court.

*Mr. Alexander H. Smith* and *Mr. Henry Newbegin* for plaintiff in error.

*Mr. W. H. Hubbard* for defendant in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

Plaintiff's right to an injunction was urged in the state courts upon several grounds, but the only questions presented to us are whether the ordinance of December 20, 1887, permitting the railway to construct the bridges and their approaches, constituted a contract between the railway company and the city for the perpetual maintenance of such bridges; and whether the subsequent ordinances of February 7, 1893, impaired the obligation of such contract, or deprived the plaintiff of its property, or the use and enjoyment thereof, without compensation or without due process of law.

We have found some difficulty in evolving any contract at all from the ordinance of December 20, 1887, which, upon its face, is a permission or authority to construct these bridges under certain requirements and specifications, and to keep them in repair. It seems that, in the original construction of the railroad in 1855, a deep cut of eleven to twelve feet was made at and between these highway crossings, and in restoring the highway to a passable condition, as the company was required to do under the law of Ohio, wooden bridges were constructed over the railroad track and distant from it in the clear about sixteen feet. After the construction of the railroad, and some time prior to the year 1876, this territory was brought within the limits of the village of Defiance, and remained within such limits until the village was organized as a city.

In 1876, the village, wishing a sidewalk or foot bridge constructed over the track of the company, entered into an agreement with the company, embodied in a village ordinance, by which the latter gave permission to the village to erect and maintain a foot bridge across its track, which the village agreed to keep and maintain forever in safe condition and good repair at its own cost. It was further agreed that the maintenance of such foot bridge or sidewalk should be subject to the inspection and approval of the railroad company's engineer, and should be built, renewed and repaired from time to time as directed by such engineer, the village agreeing to be responsible for its safe repair and maintenance.

About the year 1880, the village was organized into a city, and in the year 1887, the railroad company, in order to prevent accidents, decided to elevate the bridges, and for that purpose applied to the city council for authority to do so. This authority was given by the ordinance of December 20, 1887.

The language of this ordinance is rather that of a license than that of a contract: the railway is authorized to erect new bridges of a certain construction, provided that the company shall also build sufficient approaches and grade to each of said bridges, and keep them in good repair. The city itself

agrees to do nothing, except to permit gravel to be taken from its gravel bed, without charge, for the construction of such approaches. It does not agree that the bridges or their approaches shall remain any particular length of time, or that it shall not make new requirements as the growth of the city may seem to suggest. The only contract as to time which could possibly be extracted from this ordinance would be that the railway company, on building the bridges and approaches, should be entitled to maintain them in perpetuity. The result would be that, if the city should, in the growth of its population, become thickly settled in the neighborhood of these bridges, they would stand forever in the way of any improvement of the streets. This proposition is clearly untenable. It is incredible, in view of the language of this ordinance, that the city could have intended, or the railroad company have expected, that the former thereby relinquished forever the right to improve or change the grade of these streets.

If it were possible that a city could make such a contract at all, it could only be done by express authority of the legislature and in language that would admit of no other interpretation. It is claimed that the construction of the sidewalks by the railroad company was a consideration, since it had been the duty of the city up to that time to keep them in repair; but it surely could not be a consideration for the perpetual maintenance of the bridges. If it were a consideration for anything it would simply be for the permission given to the railway to build the bridges — a permission obtained upon a special application of the railway company. Properly construed, this ordinance was simply a license to the company to build these bridges, and to continue them until the city council should conclude that it was for the public interest to so change the grade of the street as to make it a level crossing.

That the city, in the absence of a statute permitting it, would have no authority to enter into such a contract with the railroad company is admitted; but it is claimed that such authority is found in section 3283 of the Revised Statutes of Ohio, which, so far as the same is material, is as follows: "If it be necessary in the location of any part of a railroad to

occupy any public road, street, alley, way or ground of any kind, or any part thereof, the municipal or other corporation, or public officers or authorities, owning or having charge thereof, and the company, *may agree upon the manner, terms and conditions* upon which the same may be used or occupied," etc. By the next section (3284), whenever in the construction of a railroad a public road or stream of water is crossed or diverted from its location or bed, the company is required, without unnecessary delay, to place such road or stream "in such condition as not to impair its former usefulness."

Reading these two sections together, it is open to doubt whether section 3283 is not confined to cases where the railroad runs along and upon the street, road or alley, in which case some kind of contract or agreement with the municipality would seem to be almost necessary for the mutual accommodation of the railroad and the public, who desire to retain the use of the street for ordinary travel. The matter of *crossing* the street, however, is treated by section 3284 as one of the necessary incidents of railroad construction; and all that is required is that the company, after having made the crossing, shall replace the road in such condition as not to impair its usefulness. This appears to be the construction put upon these sections by the Ohio courts. *Lawrence Railroad Co.* v. *Cobb,* 35 Ohio St. 94; *Lawrence Railroad Co.* v. *Williams,* 35 Ohio St. 168; *Little Miami Railroad* v. *Commissioners,* 31 Ohio St. 338; *Pittsburgh, Fort Wayne &c. Railway Co.* v. *Maurer,* 21 Ohio St. 421; *State* v. *Dayton &c. Railroad,* 36 Ohio St. 434.

But conceding, for the purposes of this case, all that is claimed by the railroad company from its construction of section 3283, the fact still remains that the ordinance of December 20, 1887, was not adopted in pursuance of the power to contract, but in pursuance of the legislative power vested in the city by section 2640 of the Revised Statutes, which enacts: "That the council shall have the care, supervision and control of all public highways, streets, avenues, alleys, sidewalks, public grounds and bridges within the corporation, and shall cause

the same to be kept open and in repair and free from nuisance."

We are also pointed to section 2 of the ordinance as indicating that a contract was within the contemplation of the parties. This section is as follows:

"SEC. 2. The entering upon the work of constructing said bridges by said company shall be taken as an acceptance of the terms thereof by said company, and shall be regarded as superseding any contract or agreement heretofore existing between said company and said city as to either of said bridges."

This section, however, does not change that which, in its nature, is a license into a contract that these bridges shall remain for any particular length of time. The entering upon the work of construction might well estop the railroad company from objecting to the requirement that the bridge should be constructed in the manner specified in the ordinance; and might also estop the city from making any farther or different requirements in that connection; and to this extent there may be said to have been a contract; but when it is claimed that the city thereby agreed that the bridges so constructed should remain forever, and that it thereby waived its rights to change the grade or the method of crossing, we are importing into the contract by construction something which is not found there; which the parties have not agreed to, and which, if the city had any power at all to stipulate, should have been expressed in the clearest language.

In the case of the *Philadelphia, Wilmington &c. Railroad's Appeal*, 121 Penn. St. 44, relied upon by the plaintiff in error, the legislature conferred upon the mayor and the council of the city of Chester express authority to grant to certain railroad companies "the use and occupation of the streets, lanes, courts and alleys lying within three hundred feet of the said railroads, . . . to be used and occupied by the said railroad companies, respectively, only so long as the said streets . . . shall remain open to public use and travel," etc. Pursuant to this authority, and to a city ordinance, a formal agreement was entered into between the city and the railroad company that a certain street should be open to public use and travel; its

grade established and fixed for the purpose of having the street cross the railroad at such a height above the track as would permit the free operation of the railroad under the street, and prevent the dangers of a level crossing. The railroad on its part contracted to build a bridge over its track. It was held that the city had power to make the contract; that the rights conferred by the contract upon the railroad company were inviolable; that there was no question as to its performance of the contract, and the question as to the right of the municipality to grant away the control of its streets was foreign to the discussion. The city having enacted an ordinance altering the grade of the street in such manner as to cross the railroad at a level, and thereby destroy the overhead crossing, it was held that this was a violation of the contract.

There is no necessary conflict between that case and the position here assumed, as the act of the legislature gave the city express permission to grant to the companies the use and occupation of its streets, "so long as the said streets . . . shall remain open to public use and travel," and declared that such grant should be "as valid and effectual to transfer the rights and privileges therein contracted for to the said railroad companies, or any of them, . . . as if made between individuals." If the court, however, is to be considered as holding that an agreement or license to construct bridges, which is silent as to time, should be construed as an agreement that they are to remain in perpetuity, we should find ourselves confronted with too many authorities to the contrary to accept it as a sound exposition of the law.

Indeed, the general principle that the legislative power of a city may control and improve its streets, and that such power, when duly exercised by ordinances, will override any license previously given by which the control of a certain street has been surrendered to any individual or corporation, is so well established, both by the cases in this court and in the courts of the several States, that a reference to the leading authorities upon the subject is sufficient. Indeed, the right of a city to improve its streets by regrading or other-

wise is something so essential to its growth and prosperity that the common council can no more denude itself of that right than it can of its power to legislate for the health, safety and morals of its inhabitants.

In the early case of *Goszler* v. *Georgetown*, 6 Wheat. 593, it was held that the power given to the corporation to grade the streets of the city was a continuing power, and the corporation might from time to time alter the grade so made. It was said by Mr. Chief Justice Marshall "that the power of graduating and levelling the streets ought not to be capriciously exercised. Like all power, it is susceptible of abuse. But it is trusted to the inhabitants themselves who elect the corporate body, and who may therefore be expected to consult the interests of the town. . . . There may be circumstances to produce a general desire to vary the graduation, to bring the streets more nearly on a level, than was contemplated in the first ordinance ; and if this may occur, we cannot say that the legislature could not intend to give this power of varying the graduation when the words they employ are adapted to the giving of it."

In *Transportation Co.* v. *Chicago*, 99 U. S. 635, which was an action to recover damages sustained by the construction of a tunnel under the Chicago River along the line of La Salle street, it was held that as the city was authorized by law to improve the street by building a bridge over or a tunnel under the river where it crossed the street, it incurred no liability for the damages unavoidably caused to adjoining property by obstructing the street or the river, unless such liability were imposed by statute ; that if the fee of the street be in the adjoining lot owners, the State has an easement to adapt it to easy and safe passage over its entire length and breadth ; and that when making or improving the streets, in the exercise of an authority conferred by statute, the city is the agent of the State, and if it acts within that authority, and with due care, dispatch and skill, it is not at common law answerable for consequential damages.

In the recent case of *Baltimore* v. *Baltimore Trust & Guarantee Co.*, 166 U. S. 673, it was held that, where the

legislature of Maryland had given the mayor and city council of Baltimore power to regulate the use of the streets, lanes and alleys in said city, by railway and other tracks, and the city council had by ordinance authorized the railway company " to lay down and construct double iron railway tracks for the purpose of doing business . . . on Lexington street westwardly to Charles street from North street," the city council might repeal such ordinance so far as the existence of double tracks in that portion of Lexington street, lying between North and Charles streets, would be inconsistent with the reasonable use of the street at that point by the public and other vehicles.

In *Presbyterian Church* v. *City of New York*, 5 Cowen, 538, the corporation of the city had conveyed lands for the purposes of a church and cemetery, with a covenant for quiet enjoyment, and afterwards, pursuant to a power granted by the legislature, passed a by-law prohibiting the use of these lands as a cemetery. It was held that a corporation could not by contract abridge its legislative power, and that this was not a breach of the covenant which entitled the party to damages, but was a repeal of the covenant. See also *Coates* v. *New York*, 7 Cowen, 585.

The case of *N. Y. & N. E. Railroad* v. *Bristol*, 151 U. S. 556, has an important bearing upon the point in issue here. In that case an act of the legislature of Connecticut, abolishing grade crossings as a menace to public safety, was held to be an exercise of the police power of the State and applicable to the charter of a railroad corporation, which was subject to alteration and amendment by the legislature. The Supreme Court of Connecticut held that the statute operated as an amendment to the charters of the railroad companies affected by it; that as grade crossings are in the nature of nuisances, the legislature had a right to cause them to be abated, and to require either party to pay the whole or any portion of the expense; that it was the settled policy of the State to abolish grade crossings as rapidly as could be reasonably done, and that all general laws and police regulations affecting corporations were binding upon them without their assent. This

court affirmed the ruling of the Supreme Court of Connecticut, saying that "The governmental power of self-protection cannot be contracted away, nor can the exercise of rights. granted, nor the use of property be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury." See also 2 Dillon on Municipal Corp. §§ 685, 716;. 2 Beach on Pub. Corp. §§ 1068, 1208; *Davis* v. *The Mayor,* 14 N. Y. 506; *Milhau* v. *Sharp,* 27 N. Y. 611; *Coleman* v. *Second Ave. Railroad,* 38 N. Y. 201 ; *Detroit* v. *Fort Wayne & Elmwood Railway,* 66 Michigan 642; *Chicago, Burlington &c. Railroad* v. *Quincy,* 139 Illinois, 355; *Roanoke Gas Co.* v. *Roanoke,* 88 Va. 810 ; *Louisville City Railway* v. *Louisville,* 8 Bush, 415.

While municipalities, when authorized so to do, doubtless have the power to make certain contracts with respect to the use of their streets, which are obligatory upon them, *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650; *New Orleans Water Works Co.* v. *Rivers,* 115 U. S. 674; *City Railway Co.* v. *Citizens' Street Railroad Co.,* 166 U. S. 557; *Indianapolis* v. *Indianapolis Gas Light Co.,* 66 Indiana, 396; *Indianapolis* v. *Consumers' Co.,* 140 Indiana, 107, the general rule to be extracted from the authorities is that the legislative power vested in municipal bodies is something which cannot be bartered away in such manner as to disable them from the performance of their public functions. These bodies exercise only such powers as are delegated to them by the sovereign legislative body of the State. Such powers, however, are personal to the municipalities themselves, and, being conferred for the benefit of the whole people, in the absence of authority to that effect, cannot be bestowed by contract or otherwise upon individuals or corporations in such manner as to be beyond revocation. Whatever construction be given to the ordinance of December 20, 1887, it cannot be held to stand in the way of a power to make such changes as the growth of population may seem to require.

In the *Matter of Opening First Street,* 66 Michigan, 42, it was held that the laying out and opening of streets by the

common council of the city is an exercise of legislative functions, and that any contract made by the city with an individual or corporation, by which it agrees that it will not in the future open or extend its streets in any particular place or part of the city, is an abnegation of its legislative power, unauthorized by its charter, and may be alike destructive of the convenience and prosperity of a municipality, and is void. See also *Hood* v. *Lynn,* 1 Allen, 103; *Backus* v. *Lebanon,* 11 N. H. 19; *Brimmer* v. *Boston,* 102 Mass. 19.

But aside from the general power of municipalities to care for and improve their streets, an express power is given by section 2640 of the Revised Statutes of Ohio to the common council to care for, supervise and control "all public highways, streets, avenues, alleys, sidewalks, public grounds and bridges within the corporation," and "to keep the same open and in repair and free from nuisance." Under a similar power granted by Congress to the corporation of the city of Washington it was held by this court, in *Smith* v. *Washington,* 20 How. 135, that it included the power to alter, grade or change the level of the land on which the streets by the plan of the city were laid out. It was said that although "the plaintiff may have suffered inconvenience and been put to expense in consequence of such action, yet, as the act of the defendants is not unlawful or wrongful, they are not bound to make any recompense. It is what the law styles *damnum absque injuria.* Private interests must yield to public accommodation; one cannot build his house on the top of a hill in the midst of a city and require the grade of the street to conform to his convenience at the expense of that of the public." To the same effect are *Callender* v. *Marsh,* 1 Pick. 418; *Green* v. *Reading,* 9 Watts, 382; *O'Connor* v. *Pittsburg,* 18 Penn. St. 187.

If the duty required by the statutes in those cases can only be adequately performed by removing obstructions in or changing the grade of streets, this must be regarded as fairly incidental to the power conferred, and individual proprietors are bound to acquiesce in the measure thus taken for the general good of the public. The Ohio courts seem also to

have acted upon the same principles.  Nor does the fact that
the city has given its permission to a railway company to lay
its rails upon or across a certain street deprive it of the power
to improve and control such street, and adopt all needful rules
and regulations for its use and management.  *Chicago, Bur-
lington &c. Railroad* v. *Quincy*, 136 Illinois, 563.

The ordinances of February 7, 1893, were not beyond the
powers of the common council with respect to the improve-
ment of its streets.  While in 1887, overhead bridges might
have seemed a better and safer plan of crossing the railway,
than crossing at grade, the subsequent growth of the city
may have demanded a different policy in 1893.  It is hardly
possible that the approaches required to reach an overhead
bridge, which was some ten or twelve feet above the general
level of the ground, should not have affected, to a certain
extent, the value of the adjoining property as city lots; but
whether this were so or not, it was purely within the discre-
tion of the common council to determine whether the public
exigencies required that the grade of the street be so changed
as to cross the railroad at a level.  *Dunham* v. *Hyde Park*, 75
Illinois, 371.  While the modern policy of railway engineering
usually tends to the abolition of grade.crossings, there is no
hard and fast rule upon the subject, and it may well be that
the exigencies of a certain street or locality may demand that
travel shall descend to the level of the railway rather than
ascend to a bridge built over the track.  But however this
may be, we are not at liberty to inquire whether the discre-
tion vested in the common council of determining this ques-
tion was wisely exercised; or what the motives were for
making the change; or whether the crossing so improved
was burdensome to the railroad company; or made unsafe
to persons crossing the track.  These were considerations
which might properly be urged upon the common council,
as arguments against the proposed change; but it is beyond
the province of the courts either to praise the wisdom or
criticise the unwisdom of such action.  The question before
us is simply whether the council had the power to make the
change, and of this we have no doubt.

Assuming, but not deciding, that the railway company was entitled to compensation for the bridge so taken or rendered useless, it appears from the record that resolutions declaring the necessity for improving these streets by changing the grade were duly published for two consecutive weeks in a newspaper published and of general circulation in the city of Defiance, and written notice of such resolutions were also duly served upon the plaintiff; and that the plaintiff did not, at any time, file a claim in writing with the clerk of the city for damages by reason of such improvements, as was required by the terms of the resolution. By Rev. Stat. Ohio, § 2315, persons who claim that they will sustain damages by reason of such an improvement are required to file their claim with the clerk of the corporation within two weeks after such service or the completion of the publication of the notice; and persons failing to so file their claim "shall be deemed to have waived the same, and shall be barred from filing a claim or receiving damages." The Supreme Court held that these statutes had been in force and acted upon for many years; that their constitutionality had never been called in question; that they were applicable to the street improvements in question, and that under them the plaintiff's claim for compensation, if it had any, was waived and barred by failing to file it within the time required. "The plaintiff," said the court, "is charged with knowledge of the law, and, in the absence of any showing to the contrary, must be presumed to have voluntarily withheld its claim for compensation and damages, and thus prevented an inquiry into and assessment of them; and it seems clear that an owner, who has been afforded an opportunity of having compensation and damages assessed him, in the constitutional mode, for property taken or injured in the making of a street improvement, and has failed to avail himself of that opportunity, cannot, after having thus waived his right, enjoin the improvement on the ground that compensation has not been paid or tendered him."

Upon the whole, we think it clear that the common council acted within its powers in changing the grade of the street in

question, and that the plaintiff has no legal right to complain of its action. The decree of the Supreme Court of Ohio is, therefore,

*Affirmed.*