WHEELING TRACTION CO. v. BOARD OF COM'RS OF BELMONT COUNTY, OHIO, et al.

(Circuit Court of Appeals, Sixth Circuit. January 8, 1918.)

No. 3073.

1. STREET RAILROADS ⬥38—REPAVEMENT—AGREEMENTS—MODIFICATION.
  Where defendant's predecessor was granted a franchise to construct and maintain an electric railway on county roads and agreed, for himself, his successors and assigns, to pave and maintain the tracks in the same condition as the remainder of the roadway was paved, an agreement between defendant and the county commissioners, thereafter entered into, which allowed defendant to change the rails used, and provided that defendant should pave the tracks and for one foot outside thereof, with a material that then was used on the roadway, was without consideration, and cannot be deemed to have abrogated the original obligation of defendant, so as to excuse it from thereafter repaving the track from the time the county commissioners should change the paving material.

2. STREET RAILROADS ⬥38—REPAVEMENT—COUNTY'S AUTHORITY.
  While the powers conferred by Act of April 16, 1900 (94 Ohio Laws, p. 364), and other statutes upon county commissioners of highways may not be so comprehensive as those conferred on municipal corporations, they are to be construed according to the same rules; hence the county commissioners cannot contract away their police power to regulate the highways, and an agreement that defendant traction company should pave its tracks with a particular material does not preclude the commissioners from thereafter ordering a change.

3. HIGHWAYS ⬥95(1)—COMMISSIONERS—SURRENDER OF POLICE POWER.
  County commissioners cannot validly surrender or alienate their police power to regulate highways.

4. STREET RAILROADS ⬥38—REPAVEMENT.
  The grantee of a franchise to operate an electric railway on the highway takes the same subject to the police power of the county commissioners, and where not unreasonable the commissioners may require the successor of the grantee, who was required to pave between the tracks and for one foot outside thereof, to change the pavement to conform with that placed on the remainder of the highway.

5. SPECIFIC PERFORMANCE ⬥26—STREET RAILROADS ⬥38—NATURE OF REMEDY—REPAVEMENT CONTRACTS.
  Specific performance of a contract can be directed where the work to be done is defined, where plaintiff has a substantial interest in its ex-

ecution, which cannot adequately be compensated for by damages, and where defendant has, by contract obtained from plaintiff, possession of the land on which the work is to be done; hence, where under the terms of its franchise a traction company was required to pave its tracks and for one foot on either side thereof with the same material used on the remainder of the county road and to maintain the same in proper condition, such company may be ordered to specifically comply with its agreement by repaving the tracks and the portion outside thereof with the same material adopted by the county commissioners for the pavement for the remainder of the road, for the company, having control of the operation of its road, can best schedule the running of its cars and fix the hours of labor for pavers, and an action at law for damages might, in event of the insolvency of the company, prove an inadequate remedy.

Appeal from the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

Suit by the Board of Commissioners of Belmont County, Ohio, and the Trustees of Pultney Township, Belmont County, against the Wheeling Traction Company. From a decree for complainants, defendant appeals. Affirmed, with modification.

Gordon D. Kinder, of Martin's Ferry, Ohio, for appellant.

Danford & Danford, of Bellaire, Ohio, and George Thornburg, of St. Clairsville, Ohio, for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

PER CURIAM. The commissioners of Belmont county and the trustees of Pultney Township, Ohio, brought suit in the Belmont court of common pleas to enforce specific performance of a covenant contained in a railway franchise contract between them and the appellant company. The suit was removed to the court below on the ground of diversity of citizenship. Subject to such contract, the company was operating an electric street railway over the county road known as the Bellaire and West Wheeling road, from the north corporate boundary of the city of Bellaire northwardly to the south line of Pease township in Belmont county. Decree was entered against the railway company, requiring it within seven months to comply with the conditions of its franchise by conforming the grade of its track to that of the roadway occupied by it and by paving between its rails and also one foot outside of each rail with the same material (to wit, brick, laid upon a proper foundation of cement) as that of the remainder of the roadway which had theretofore been improved by the public authorities having control of the entire roadway. The railway company appeals. The facts of the case, with applicable decisions, were so fully stated and considered by the learned trial judge as to dispense with the necessity for an opinion here; though it is important to call attention to the rulings ultimately made by the Supreme Court of Ohio against the defendant railway companies in City of Columbus v. C., C., C. & St. L. Ry. Co., 79 Ohio St. 473, 475, 87 N. E. 1132, and the C., C., C. & St. L. Ry. Co., 2 Ohio Cir. Ct. R. (N. S.) 305, cited near close of Judge Sater's opinion in the instant case; and his decision upon the subject of specific performance is well within the principle of those rulings. We approve the opinion below and affirm

the decree, subject, however, to a modification of the decree so as to require that the seven-month period therein provided shall commence to run from the time the mandate shall have been received and filed below. The opinion follows:

"Sater, District Judge. The purpose of this action is to require the defendant to grade and pave its track between the rails and for one foot outside of each rail, with paving brick. On April 14, 1893, the county commissioners of Belmont county granted to A. R. Leyda the right to construct and maintain an electric street railway on certain roads in Belmont county. The grantee agreed for himself, his successors and assigns, at all times to keep and maintain the tracks between the rails and for one foot outside of each rail in as good condition, and with the same material, as the remainder of the roadway is kept by the proper legal authorities, and at a grade to conform with the general grade of such roadway. If a change in the grade of the roadway should be required, the grantee must conform the grade of the railway so as to preserve the uniformity of the entire road. If bridges or culverts were necessarily rebuilt, strengthened, or repaired, the grantee was to pay one-half of the expense incurred. The cars and motors to be operated were given the use of the tracks, and every wagon, cart, rig, carriage, or other vehicle is by the terms of the grant with reasonable dispatch to turn out, whenever any motor or car approaches so that the track may be free and unobstructed. The grantee agreed to maintain the top of the rail on a level with the public highway. A railway was constructed in pursuance of the above-mentioned grant. On April 1, 1901, an agreement was entered into between the commissioners and the defendant company, which, by successive assignments, had succeeded to the rights of Leyda, wherein it was stipulated that instead of girder rails mentioned in the original grant, weighing not less than 52 pounds to the yard, the defendant might have the privilege of laying and maintaining T-rails, provided the company should plank solidly all crossings, turnouts, and switches inside and one foot outside of the rails—all tracks, turnouts, and switches to be filled flush with the top of the rails with broken limestone and to be kept in that condition so as to enable teams to travel on such tracks and drive on and off with all the convenience reasonably attainable. In the town of West Wheeling, however, the rails were to be planked inside and one foot outside of the rails, if the trustees of Pultney township should so elect, if T-rails should be used. Such planking, however, was not to be required if the trustees elected that girder rails should be used. The agreement provided that it did not modify in any respect any other condition or provision, express or implied, in the original grant. An agreed statement of facts supplemental to the oral evidence given, recites, touching the situation on April 1, 1901, that the space between the rails of the traction company along the part of the line in question had been filled or partly filled with gravel and broken limestone some time prior to such date. At the time of the execution of such supplemental agreement the space between the rails was only partly filled, and no improvements on the roadway were about to be undertaken. On June 16, 1902, another agreement was made between the commissioners and defendant relating inter alia to a certain bridge. It also recited that the other terms and conditions of the Leyda contract should remain in full force. At the date of the 1901 agreement the county road not occupied by defendant's track was improved by being covered with broken limestone. Plaintiffs, it is admitted, have been, and are, invested with the care and management of the county road. In 1912 plaintiffs improved the road, in so far as not occupied by the defendant, by grading and paving it with brick, excepting a small portion at its north end, the contract for the improvement of which, however, had, at the time of the filing of the petition, been entered into. The defendant was called upon by the plaintiffs to pave in like manner its track and for one foot outside of each rail. It refused thus to pave between its rails, asserting that it is under no obligation so to do and that the agreement of April 1, 1901, requires it to fill the space between the rails with broken limestone only. The photographs and other evidence submitted establish by a fair preponderance that the space between the defendant's rails is not so filled with broken stone

or slag—at least, at all points—as to admit of the convenient or reasonable use of the same by vehicles passing over the highway and having occasion to drive upon the defendant's tracks.

[1] "The right of the traveling public to use the whole of the highway in so far as such use is consistent with the operation of cars on the company's track was preserved by the original grant. The grantee and his successors were required to use the same kind of material between and adjoining its rails as might be employed by the proper public officers for so much of the roadway as lies outside of the granted right of way. The power of determining what such material should be was vested in such officers. The two subsequent agreements hark back to that with Leyda, and declare that it remains unimpaired except as modified by them respectively. The plaintiffs assert that the agreement of 1901 had reference to the then existing condition only, contemplated merely the fulfillment of the requirements of the original grant, and did not relieve the defendant from the future use of the same material as might thereafter be employed in subsequent improvements of the road outside of the defendant's right of way. The defendant contends that by the agreement of 1901 the plaintiffs are bound by contract not to exact of it the use of any material between its rails other than broken stone, that its right to use such material is continuing, and that it may not be required to pave such space with brick. Is this position sound?

"In view of the agreed statement of facts, so much of the agreement of April 1, 1901, as provided that, as a condition of the use of T-rails, the defendant company should fill all tracks, turnouts, and switches inside and one foot outside of the rails with broken stone was an agreement that the company should do what it was already obligated to do, and was therefore without consideration. I also interpret the proviso of that agreement that the company, when it should do what it was already required to do, should keep the right of way in that condition to mean no more than that such right of way should be kept in the same condition as the remainder of the roadway, which was then covered with broken stone. That the commissioners did not intend to barter away the terms of the original grant is manifest from the reservation that the agreement of April 1st should not modify in any respect any other condition or provision, express or implied, which reservation was subsequently repeated in the later agreement of June 16, 1902. If this interpretation is correct, the terms of the original grant remain unimpaired as to the duty to maintain the space between the tracks [and] for one foot on each side of them, and the plaintiffs are therefore entitled to the relief asked for. If, however, my interpretation is unwarranted, I am still of the opinion that the plaintiffs should prevail, for the reasons hereafter stated.

[2, 3] "A résumé of the powers vested in county commissioners and township trustees as regards highways will not be attempted. Allusion, however, may be made to the act of April 16, 1900 (94 Ohio L. 364), to the various sections of the Revised Statutes of Ohio in force when the several agreements above mentioned were made, and also to those of the present time, touching the powers and duties of commissioners and township trustees. Rockel in his recent work on Roads and Bridges, chapter 6, in commenting on section 6906, G. C. (section 85, 106 Ohio Laws, 597, Act May 17, 1915), (pp. 153, 154) states that the sections of such chapter combine the various previously existing laws conferring powers on the county commissioners to construct and improve roads. Whether or not the powers conferred on commissioners and trustees have been and are quite as comprehensive as those granted by the General Assembly to municipal corporations they are akin to those enjoyed by municipalities. The same general rules of law as to the powers which have been and may be exercised by county commissioners and township trustees on the one hand and municipalities on the other apply to a railway whether it operates on a county road or the streets of a city or village.

"An illuminating case, whose doctrine is controlling, is that of Wabash R. R. Co. v. Defiance, reported in 10 Ohio Cir. Ct. R. 27, 52 Ohio St. 262, 40 N. E. 89, and 167 U. S. 88, 17 Sup. Ct. 748, 42 L. Ed. 87, in which all of the state courts and the Supreme Court of the United States by like reasoning reached the same result. The railroad company had been authorized to erect two

new bridges over two public streets, provided the bridges should be of good and substantial construction, be located in the center of the respective streets, have 18-foot roadways and a good substantial sidewalk 8 feet wide on each side and should at all times be kept in good order and repair by the company. The bridges were to be of a given height above the company's rails, and were to have sufficient approaches with a specified grade, which grade was to be made firm and solid by the use of either stone or gravel. If gravel should be used, it was to be taken from the city's gravel beds. The approaches to the sidewalk were to be kept in constant repair, and were to be brought up to the proper level of the then existing walks by broad, safe steps, all to be kept in repair by the company to the extent of its right of way. The entrance by the company on the construction of the bridges was made an acceptance by it of the terms of the ordinance. The provisions of the ordinance were quite as specific as those of the agreement of April 1, 1901, here under consideration. The company faithfully performed the conditions imposed upon it. Thereafter the city council so changed the grade of the streets as to bring them to the level of the company's tracks, and assessed the cost of the change on the real and personal property of the municipal corporation, including that of the railway company. The railway company resisted the proposed change, and asserted in its petition its right to a continuance of the bridges and approaches as specified in, and as constructed in accordance with, the original ordinance, and pleaded the dangers and expense incident to the proposed change. The state Supreme Court held that every grant in derogation of the right of the public in the free and unobstructed use of the streets, or restrictive of control of the proper agencies of the municipal body over them, or of the legitimate exercise of their powers in the public interest, must be construed strictly against the grantee, and liberally in favor of the public, and never extended beyond its express terms when not indispensable to give effect to the grant; that the original ordinance calling for new bridges of a specified description, to be kept in repair by the company, did not divest the municipal authorities of their control over the streets, nor impair their power to improve the same, nor entitle the railway company to perpetually maintain the bridges as constructed, and that the ordinance and the privileges granted by it are subject to a proper exercise, by the municipal body, of its power to improve the streets and make such changes in the grades as may be necessary to subserve the public interest. The obvious and stated reason for the ruling was that the powers conferred on municipal corporations with respect to the opening, improvement, and repairing of the streets and public ways are held in trust for public purposes, and are continuing in their nature, to be exercised from time to time as the public interests may require, and cannot be granted away, or relinquished, or their exercise suspended, or abridged, except when and to the extent legislative authority has expressly been given to do so. Mr. Justice Brown spoke for the United States Supreme Court, which held that, properly construed, the original ordinance was simply a license to the company to build the bridges and to continue them until the city council should conclude that it was for the public interest to so change the grade of the street as to make it a level crossing. There was no agreement on the part of the city that the bridges should remain any particular length of time, or that it should not make new requirements as the growth of the city might suggest. If the contention of the railway company that it was entitled to maintain in perpetuity the bridges and approaches as originally constructed were sound, the result would be that, if the city should, in the growth of its population, become thickly settled in the neighborhood of the bridges, they would stand forever in the way of any improvement of the streets—a proposition declared to be untenable. It was thought to be incredible that the city intended by its ordinance or the railroad company could expect that the former relinquished forever the right to improve or change the grade of its streets. It was held that the power of city councils and of county commissioners to regulate the grading and paving of streets and their exercise of control over them is a legislative function, an exercise of the police power of the state and incapable of being bartered away.

"Differences are recognized between the Defiance Case and the one at bar.

248 F.—14

The Wabash Railroad Company owned its right of way. It did not pass through the city and operate over its tracks by virtue of a grant from the city or other state agency. The contract that was made between the parties related to a crossing which affected the use of a street and of the company's right of way. In that case, as in this, there was no abridgment of the company's franchise. The right to operate still continued. There was no contemplated disturbance of the company's roadway, although an appropriate crossing made of plank or other suitable material would doubtless have been necessary. In the instant case the defendant company does not own the soil or that portion of the street over which it operates. It merely has a right to operate over it. Such portion belongs to the public quite as much as the residue of the street, and the public has the right to use such right of way for all purposes quite as much and in the same manner as the residue of the street, so long as it does not interfere with the operation of the defendant company's cars. Such company would be temporarily disturbed in the operation of its cars, but to the extent only of such adjustment of its tracks at the point where the work of paving is in progress as would admit of the continuance of its business. Some inconvenience would result even if broken stone should be continued in use on its right of way. In the Defiance Case, the municipality's jurisdiction over the street and the extent to which it could barter away such jurisdiction were involved. The question was there presented, may a municipality bind itself in perpetuity to the maintenance of a given street or a portion of it in a given way, regardless of future needs and developments? The question here is, May the county commissioners thus bind themselves, and thereby the public, for the life of a franchise? The attempt so to do was held in the Defiance Case, ineffectual, because unauthorized by the city charter or laws governing the city. It was said (52 Ohio St. 309, 40 N. E. 89) that the statute does not contemplate the destruction of the street, or the cessation of its use by the public or its withdrawal from the control and supervision of the proper municipal officers. Mr. Justice Brown held (167 U. S. 94, 17 Sup. Ct. 748, 42 L. Ed. 87) that: 'If it were possible a city could make such a contract at all, it could only be done by express authority of the Legislature, and in language that would admit of no other interpretation.' No statute is cited conferring on county commissioners express legislative authority to make a contract such as the defendant company claims to have been made.

"The arrangement of April 1, 1901, for the use of broken stone by the defendant company, was not a continuing contract which conferred the right in perpetuity on the defendant to use such material and such only for the improvement of its roadway. In Reading v. United Traction Co., 202 Pa. 571, 52 Atl. 106, it appears that a street railway company had with its tracks occupied the streets of a city with the latter's consent on condition (1) that it pave its right of way and keep the same in good repair; and (2) that it pave its right of way in a specified manner, superior to that of the then existing streets, and keep such paving in good repair. It was held that the city, upon notice to the company of the adoption of an improved pavement for the rest of the street, with which the original pavement of the right of way was incongruous and practically incompatible, might require the company—the pavement of its right of way being in fact out of repair—to replace the same with a pavement reasonably corresponding with the street pavement adopted. In that case it will be noted that the company was originally required to use a particular pavement upon its right of way and keep that sort of a pavement in repair, but it was held that such provision in the ordinance did not deprive the city of the right subsequently to put down a different and more expensive pavement. It was there said that it was not intended that the maintenance of a cobblestone pavement by the railway company should forever be the measure of the latter's service in return for the grant of the use of the streets. The language of Philadelphia v. Ridge Avenue Pass. Ry. Co., 143 Pa. 444, 22 Atl. 695, was approved to the point that such a proposition could not be entertained for a moment, and that it was never contemplated that the railway company would continue to exist and perform its corporate functions in a cobblestone age. It was called into being with a view to progress.

"Elliott, Roads and Streets (3d Ed.) § 987, has stated with force the applicable rule, citing the Reading Case. See, also, Reading v. United Traction Co., 215 Pa. 250, 64 Atl. 446, 7 Ann. Cas. 380 and State v. Railroad Co., 52 La. Ann. 1570, 28 South. 111.

"The right to regulate streets and highways and to control the improvement of the same, being an exercise of the police power, neither a city council, a board of commissioners, or trustees of a township can barter such right away. This power the plaintiffs cannot refuse to exercise when public necessity or convenience demands that it shall be done, nor could they be allowed to excuse their failure to exercise such power upon the grounds that they had by contract deprived themselves of the right so to do. Louisville City Ry. Co. v. City of Louisville, 8 Bush (Ky.) 415, 420. In the last-named case it appears that the railway company had placed between its tracks a boulder pavement to correspond with that of the street, but it was said: 'The law reserves to the council the right to regulate the manner of the construction and reconstruction of the street railways. The city government in the exercise of its legislative powers must determine as to the necessity for or the propriety of the improvement of the streets and also to the manner of such improvement. The contract with the railway does not impair its right to put down the Nicholson pavement upon the streets through which the right of way has been granted to that corporation.'

"In Anderson v. Fuller, 51 Fla. 380, 41 South. 684, 6 L. R. A. (N. S.) 1026, 120 Am. St. Rep. 170, it was ruled that, while municipalities may by ordinance grant to individuals and corporations the privilege of occupying the streets and public ways for lawful purposes, such as railroad tracks, poles, wires, gas, and water pipes, such rights are at all times held in subordination to the superior rights of the public, and all necessary and desirable police ordinances that are reasonable may be enacted and enforced to protect the public health, safety, and convenience, notwithstanding the same may interfere with legal franchise rights.

"In Village of Mechanicsville v. S. & M. St. Ry. Co., 35 Misc. Rep. 513, 71 N. Y. Supp. 1102, affirmed 174 N. Y. 507, 66 N. E. 1117, two franchises had been granted to the defendant, each of which provided that the space between the rails and a space of at least 20 inches wide outside of the rails on both sides of the track should be paved with 'small stone' and the same should at all times be kept in good condition. Subsequently the village required of the railway company a 6-inch excavation, filled in with sand or gravel and covered with vitrified paving brick. The railway company refused to pave, and the village at its own expense did the work it had required of the company. It was held entitled to recover of the railway company the expense of such paving, for the reason that the village had a right to exact what it deemed a paving suitable at the time it was ordered, and was not limited to requiring a pavement composed of 'small stone,' and that the contracts or franchises granted by the village trustees, persons having limited powers, were not a defense, as the trustees could not give up the streets to private corporations nor surrender the right of the public to have the streets in a proper condition for use, such powers being held in trust for the public benefit and incapable of abrogation or delegation to private parties. The requirement of the use of 'small stone,' it was said, was suited to the situation when the grant was made, but that it would be a dangerous conclusion to hold that the provision relating to the use of 'small stone' at the time of the grant gave the railway company the right to pave the streets with such stone for all future generations, whatever the emergency which excited other requirements. See, also, Nellis, Street Railways, § 157 (2d Ed.) citing the above case.

"Elliott on Roads and Streets (3d Ed.) § 939, states the rule thus: 'The general rule is well settled that no contract can be made which assumes to surrender or alienate a strictly governmental power which is required to continue in existence for the welfare of the public. This is especially true of the police power, for it is incapable of alienation. It cannot be doubted that a company which secures a right to use the streets of a municipal corporation takes it subject to the police power resident in the state as an inalienable attribute of sovereignty.'

[4] "The above rule must necessarily apply to public highways other than streets within municipalities. A grant of the right to own property and transact business confers no immunity from any police control to which a citizen could be subjected, and a reasonable regulation of the enjoyment of the franchise is not a denial of the right nor an invasion of the franchise, or a deprivation of property, or interference with the business of the grantee. Nellis, Street Railways, § 117; Cape May R. R. Co. v. Cape May, 59 N. J. Law, 393, 395, 36. Atl. 679, 36 L. R. A. 656. The demand made by plaintiffs of the defendant as regards the paving of its right of way with brick to conform to the remainder of the road is not unreasonable or shown to be so.

[5] "There are no insuperable obstacles preventing the defendant's specific performance of its contract. Why should the plaintiffs, or any of them, at public expense, construct the pavement which the defendant ought to construct, and then be required by an action at law, with its necessary attendant delay, to recover or seek to recover what the taxpayers should not have been required to pay? If the defendant should in the meantime become financially embarrassed or insolvent, the burden of maintaining the street between and on each side of defendant's rails would fall in part or wholly on the public as a burden for which it is in no wise responsible. The improvement is to be made, it is true, not on the defendant's own land, but nevertheless on its right of way, and its construction must cause some necessary inconvenience. The defendant, having control of the operation of its road, can best schedule the running of its cars and fix the hours of labor for pavers. The court has jurisdiction to grant specific performance of a contract for construction where three things concur: (1) Where the work to be done is defined; (2) where plaintiff has a substantial interest in its execution, which cannot adequately be compensated for by damages; and (3) where the defendant has, by the contract obtained from plaintiff, possession of the land on which the work is to be done. 36 Cyc. 583. On the next succeeding page are given instances in which specific performance has been exacted of railroads. In the instant case the contract is fair, complete, and certain, and the public welfare demands its enforcement. The case falls within the rule announced in City of Columbus v. C., C., C. & St. L. Ry. Co., 2 Ohio Cir. Ct. R. (N. S.) 305, in which the authorities are intelligently reviewed. Note, also, Village of Milford v. C., M. & L. Traction Co., 4 Ohio Cir. Ct. R. (N. S.) 191, and City of Toledo v. L. S. & M. S. Ry. Co., 17 Ohio Cir. Ct. R. 265.

"An order may be taken in accordance with the above. Attention of counsel is directed to the fact that the copy of the original agreement between the commissioners and Leyda, attached to the petition, is incorrect and does not conform to the certified copy of such agreement."